| | | |
|---|---|---|
| **LINDA GAIL THOMPSON, as Personal Representative of the Estate of JEROME THOMPSON,** )<br>)<br>)<br>) | | |
| **Plaintiff,** ) | | |
| ) | **ORDER** | |
| **vs.** ) | | |
| ) | | |
| **CITY OF CHARLOTTE et al.,** ) | | |
| ) | | |
| **Defendants.** ) | | |
| ——————————————— ) | | |

     **THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Wellpath LLC, Ebone Denise Roberts, and Samantha Elliott-McLaren, (Doc. No. 86), on a Motion for Summary Judgment by Defendants Joseph Breedlove, Garry L. McFadden, and the Ohio Casualty Insurance Company, (Doc. No. 90), and on a Motion for Summary Judgment by Defendants City of Charlotte, Johnny Jennings, and Brian E. Kurcsak. (Doc. No. 92). The Court held a hearing on the motions on June 22, 2023. For the following reasons, the Court **GRANTS** Defendants' summary judgment motions and dismisses this action with prejudice.

## I.    BACKGROUND

### A.    PROCEDURAL BACKGROUND

     Jerome Thompson committed suicide in the Mecklenburg County Detention Center in Mecklenburg County, North Carolina, by jumping from the second-floor window of the pod where he was being detained. He jumped from the window on July 11, 2018, and he died the

1

next day. He was a pre-trial detainee at the time. His mother Linda Gail Thompson filed this lawsuit as the representative of Mr. Thompson's estate on July 10, 2020. Plaintiff originally named 13 persons and entities as Defendants, but she dismissed various Defendants by stipulation. The remaining Defendants are Defendants Wellpath LLC, Ebone Denise Roberts, and Samantha Elliott-McLaren ("Wellpath Defendants"), Joseph Breedlove, Garry L. McFadden, and the Ohio Casualty Insurance Company ("Sheriff's Office Defendants"), and City of Charlotte, Johnny Jennings, and Brian E. Kurcsak ("City Defendants").[1] Plaintiff brings federal constitutional claims of deliberate indifference to serious medical needs, as well as various state law claims against Defendants. As noted, this matter is before the Court on various summary judgment motions by Defendants.

### B. UNDISPUTED FACTS

In the late evening of July 9, 2018, Mr. Thompson shot a hotel clerk on Nations Ford Road in Charlotte, North Carolina. (Brian Lambe Dep. 20:4–17). Detective Brian Lambe of the Charlotte Mecklenburg Police Department ("CMPD") obtained warrants for Mr. Thompson's arrest. (Id. 20:22–23; 21:15–18). Because of the crime involved, Lambe contacted CMPD's Violent Crime Apprehension Team ("VCAT"), to serve the arrest warrant on Mr. Thompson. (Id. 21:19–25; 22:1–10).

VCAT detective Brian Kurcsak was assigned as lead detective in the search for Mr. Thompson. (Brian Kurzcak Dep. 86:23–25; 87:1–2). VCAT detectives Adelaide Kinstler and Joseph Wilson assisted Kurcsak. (Id. 102:1–6).[2] As part of his investigation, Kurscak reviewed

---

[1] The Court identifies each Defendant's role and status in the Undisputed Statement of Facts, see infra.

[2] Kinstler and Wilson were named as Defendants in the Amended Complaint, but Plaintiff filed a stipulation of dismissal which dismissed all claims against them. (Doc. No. 87).

dispatch reports in an attempt to find Mr. Thompson. (Id. 95:14–24). Kurscak learned that Mr. Thompson went to Long Animal Hospital on July 9 to "find his cat a home because he was going to commit suicide." (Id. 97:1–8). Kurscak told Kinstler and Wilson about this information. (Id. 98:3–6).

VCAT detectives arrested Mr. Thompson on July 11, 2018, in Kannapolis, North Carolina. (Id. 100:7–22). After his arrest, Detective Kurcsak drove Mr. Thompson to the Steele Creek Division office to be interviewed by Detective Lambe. (Id. 103:2–8, 11:16–19). Kurcsak entered the Steele Creek office with Mr. Thompson and informed an unidentified officer that Mr. Thompson was arrested and that "less than 36 hours ago, a call for service was placed that he was going to commit suicide" and the "[o]fficer—whoever it was—said okay." (Id. 104:1–13).

Detective Lambe attempted to interview Mr. Thompson, but Mr. Thompson declined to discuss the incident. (Lambe Dep. 38:3–15). Lambe left Mr. Thompson alone in the interview room while Lambe completed paperwork. (Id. 40:15–25; 41:1–10). After hearing noises coming from the interview room, Lambe checked on Mr. Thompson and told him to sit down in the room and not stand up. (Id. 44:13–21). Around twenty seconds later, Lambe heard more noise from the interview room and checked on Mr. Thompson. (Id. 46:14–17). Mr. Thompson was on the ground with blood coming out of his head, and blood was on the interview floor. (Id. 46:21–24). Mr. Thompson told Lambe that he fell on his own. (Id. 49:9–17). Medics then transported Mr. Thompson to the hospital. (Id. 48:8–17).

After Mr. Thompson was transported to the hospital, Lambe reviewed the security footage from inside the interview room. (Id. 50:5–10). The recorded video showed that Mr. Thompson attempted to stab himself in the neck with a pen, and then purposely fell backwards, causing his head to strike the floor. (Id. 50:11–23). Lambe was unsure whether he notified the

CMPD officers who transported Thompson to the hospital about Thompson's intentional attempts to harm himself. (Id. 53:11–19).

Officers took Mr. Thompson to Atrium Health-Pineville for his head injury at 1:44 p.m. and told the staff that he was trying to adjust his position when he fell backwards. (Doc. No. 86-4, pp. 40, 43). Mr. Thompson was assessed at the hospital and determined not to be a suicide risk. (Doc. No. 86-4, p. 40). At 3:32 pm, Mr. Thompson was medically cleared for transport to Mecklenburg County Detention Center-Central ("DC-C" or "the Jail"). (Doc. No. 86-4, p. 43, Doc. No. 86-5, p. 10).

CMPD officers transported Mr. Thompson to the Jail. When an officer brings an arrestee to the Jail, they stand by while a Sheriff's Office employee conducts a search. (Robert Sisk Dep. 25:12–25). After the search is completed, the arrestee is taken to intake. (Id. 12:23–25). During the intake process, an arrestee will be asked screening questions, get fingerprinted and photographed, see a jail nurse, and then appear before a magistrate. (Id. 26:2–25; 27:1–17). If an arrestee does not bond out after seeing the magistrate, they are sent to a classification pod pending assignment to another pod. (James Breedlove Dep. 15:21–25; 16:1–6).

Robert Sisk and Louis Venant were two Sheriff's deputies who were working intake when Mr. Thompson arrived at the Jail at 3:55 p.m. on July 11, 2018. (Sisk Dep. 12:15-18; Ex. 1); (Louis Venant Dep. 8:14–25; 9:1–7). While Sisk and Venant knew that Mr. Thompson was medically cleared to be processed at the Jail, they did not know that Mr. Thompson had attempted to harm himself in the interview room at CMPD's Steele Creek Division office. (Sisk Dep. 32:19–25; 33:1–20; 69:14–25; 74:21–25; 75:1–18; Venant Dep. 35:15–21; 45:25; 46:1–2). No one had communicated that information to Sisk and Venant. Detective Lambe acknowledged that jail staff and medical personnel should have been made aware of Mr. Thompson's efforts to

4

harm himself. (Lambe Dep. 59:18–25; 60:1–8).

Venant's only role in Mr. Thompson's intake was to fingerprint and photograph Mr. Thompson. (Venant Dep. 36:16–23). The CMPD transporting officer provided Sisk with Mr. Thompson's discharge papers, clearing him to be processed at the Jail. (Sisk Dep. 33:25; 34:1–4). Sisk noticed the bandage on Mr. Thompson's head and contacted the jail nurse, who told Sisk she would look at it when Mr. Thompson "comes back to see me." (Id. 33:15–24).

Sisk asked Mr. Thompson the questions on the Receiving Screening with Mental Health form. Sisk's role was to mark down "yes" or "no" to the numerous questions. (Id. 54:8–15). If there are any "yes" answers to the deputy's questions, the arrestee automatically goes to see the nurse. (Id. 36:25; 37:1–11). Sisk asked Mr. Thompson questions related to whether he was being treated for illnesses. (Id. 47:1–10; Ex. 4A). Mr. Thompson responded that he was being treated, so Sisk marked "yes" on the form. (Id., Ex. 4). The nurse "asks more in-depth questions pertaining to that question that was answered yes." (Id. 37:8–11). After going through the questions, Sisk asked Mr. Thompson more questions about whether he had thought about harming himself or thought that someone can control his mind. Mr. Thompson said "no." (Id. 48:13–24; 106:1–7). Sisk also asked Mr. Thompson if he had ever contemplated killing himself. Thompson replied "no." (Id. 105:25; 106:1–7).

After completing the Receiving Screening with Mental Health form, Sisk then completed the Arrest Processing Classification Record. (Id. 54:4–15; Ex. 1C). In that record, Sisk noted that he did not observe any problems, including mental health or suicide risks, with Mr. Thompson. (Sisk Dep., Ex. 1C). If there is a "yes" answer to any of the questions after the deputy completes this portion of the Receiving Screening for Mental Health form, the jail nurse reviews the form with an arrestee in arrest processing. (Laura House Dep. 43:9–25; 44:1–2, Samantha Elliott-

5

McLaren Dep. 66:1–15).

Since Mr. Thompson answered "yes" to a question on the Receiving Screening for Mental Health form, Deputy Sisk provided jail nurse Samantha Elliott-McLaren, a Wellpath LLC employee, with that form, as well as the Arrest Processing Classification Record. (Sisk Dep. 54:16–25; 55:1–6). Nurse Elliott-McLaren assessed Mr. Thompson after he saw the magistrate. (Samantha Elliott-McLaren Dep. 37:21–25; 38:1–3). Elliott-McLaren completed Mr. Thompson's screening forms and admission paperwork. (Id. 50:2–11; 52:9–18). Mr. Thompson did not inform nurse Elliot-McLaren that he was suicidal, and the nurse's review of the medical records found no indication of suicidal ideation. (Id. 56:1–23).

While Mr. Thompson informed Elliott-McLaren that he had a history of depression, and that he had thoughts of killing himself two years earlier after his wife died, he did not express that he was having current thoughts of suicide, so she did not place him on suicide watch. (Id. 78:8–17; Sisk Ex. 4). None of the CPMD officers informed Elliott-McLaren that Mr. Thompson attempted to injure himself while in CMPD custody, nor did anyone give Elliott-McLaren any documentation showing that Mr. Thompson had attempted to hurt himself. (Id. 52, ¶¶ 19–24; 55–56, ¶¶ 22–4; 75, ¶¶ 14–24; 87:15–20). Mr. Thompson informed Elliott-McLaren that he had gone the hospital to treat a laceration, but he never informed her that he hurt his head when he intentionally fell backwards while in CMPD's custody. (Id. 54, ¶¶ 4–6, Ex. H).

During the initial screening, based on her visual observations, Nurse Elliott-McLaren noted, among other things, that Mr. Thompson appeared normal; he did not appear anxious or disheveled; he was breathing normally; he denied worrying about a major life problem outside of his legal problems; none of his family members or significant others had attempted suicide; he confirmed he had close family in the community to support him; he did not express any feelings

6

of hopelessness or helplessness; he showed no signs of crying or emotional flatness; he did not appear afraid, angry or ashamed, and he denied having a suicide plan or that he had previously attempted suicide. (Ex. E, pp. 3–4). Based on this information, Elliott-McLaren concluded that Mr. Thompson was not a suicide risk. She contacted Mr. Thompson's pharmacy and confirmed his current medications. (Ex. H, Elliott-McLaren Dep. 72–73, ¶¶ 13-2). She also contacted the on-call provider and that provider gave a telephone order for the continuation of Mr. Thompson medications. (Ex. E, p. 15).

Based on Mr. Thompson's report of a history of depression, Elliott-McLaren referred Mr. Thompson for evaluation of his depression at the next available mental health appointment. (Id. 83:9-16; Sisk Dep., Ex. 4B). Following Elliott-McLaren's assessment, Sheriff's Office classification officer Deputy Tolman assigned Mr. Thompson to general classification Pod 3100. (Sisk Dep. 113:5–25; 115: 18–25; 116:1–7).

Sheriff's Office detention officer James Breedlove was working in Pod 3100 on July 11, 2018. (James Breedlove 32:21–25; 33:1). Mr. Thompson was sent to Pod 3100 around 21:10 after seeing the nurse. (Id. 43:1–9). During a shakedown (a routine search of the Pod for contraband), Breedlove noticed that Mr. Thompson was bleeding through his bandages, so Breedlove contacted his supervisor, who advised Breedlove to send Mr. Thompson to medical. (Id. 43:14–25). Mr. Thompson went to the medical unit, where he was assessed by Wellpath nurse Ebonee Roberts. (Ebonee Roberts Dep. 71:12–25; 72:1–9). Mr. Thompson informed Roberts that he fell during his arrest. (Id. 71:1–9). Roberts stated that she was unaware of any Wellpath employee who was notified of Mr. Thompson's attempts to hurt himself while in the police's custody earlier that day. (Ex. F, Roberts Dep. 84–85, ¶¶ 24–25). Roberts' progress note documented that Mr. Thompson did not appear in distress, and he denied all other complaints.

7

(Ex. E, 19). Mr. Thompson never expressed any thoughts of suicide, and Mr. Thompson did not show any signs of depression. (Id. 79:9–12). In addition, Mr. Thompson communicated appropriately with Officer Breedlove, including requesting to use a phone, and his demeanor did not seem unusual. (Id. 80:3–25).

Roberts rewrapped Mr. Thompson's bandage and sent him back to Pod 3100. (Breedlove Dep. 47:21–25; 48:1–4). Mr. Thompson arrived back to Pod 3100 at 21:26. (Id. 47:5–15). While Officer Breedlove was checking the Pod rosters, Mr. Thompson jumped from the second floor down to the first floor of the Pod. (Breedlove Dep. 57:7–16). Breedlove heard a crashing sound, saw Mr. Thompson on the floor, and called for a medical emergency. (Id. 49:10–15). Mr. Thompson died of his injuries from the jump the next day. (Doc. No. 19, ¶ 60).

On July 19, 2018, the North Carolina Department of Health and Human Services investigated Mr. Thompson's death. (Garry McFadden Dec., Ex. 1 to McFadden Dec.). On September 7, 2018, the jail inspector found no "deficiencies…during the investigation." (McFadden Dec., Ex. 1 to McFadden Dec.).

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

8

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

As noted, Plaintiff brings federal constitutional and state law claims against the various Defendants, including a claim of a due process violation under the Fourteenth Amendment based on Defendants' deliberate indifference to Mr. Thompson's serious medical need, which was his alleged imminent suicidal ideation. Defendants deny the allegations and have filed summary judgment motions as to all of Plaintiff's claims. The Court will organize the discussion of Plaintiff's various claims and Defendants' defenses according to the three groups of Defendants who filed the summary judgment motions—that is the Wellpath Defendants, who provided medical screening and care to Mr. Thompson when he arrived at the Jail; the City Defendants,

9

who transported Mr. Thompson to the Jail; and the Sheriff's Office Defendants, who were in charge of Mr. Thompson while he was at the jail. The Court addresses the summary judgment motions as to each group in turn.

## A. The Wellpath Defendants

Plaintiff asserts the following claims against Defendants Wellpath, LLC, Nurse Ebony Denice Roberts, and Nurse Samantha Elliott-McLaren (the "Wellpath Defendants"): (1) a deliberate indifference claim under Section 1983 based on failure to provide medical care and treatment; (2) a claim for wrongful death under N.C. GEN. STAT. § 28-174, and (3) punitive damages.

Plaintiff brings the deliberate indifference claim under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

For purposes of her claims under 42 U.S.C. § 1983, Plaintiff alleges that Defendants violated Mr. Thompson's rights under the United States Constitution, and the alleged deprivation of his constitutional rights was committed while Defendants were acting under the "color of state law." West v. Atkins, 487 U.S. 42 (1988).

Section 1983 claims based on an alleged lack of or inappropriate medical treatment of a pretrial detainee (such as Thompson here) fall within the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment standard for convicted prisoners. Shields v. Godfrey, No. 1:18cv602, 2021 WL 512459, at *6 (M.D.N.C. Feb. 11, 2021) (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). Regardless of which constitutional amendment

10

applies, "the standards are the same for both pretrial detainees and convicted prisoners." Id.
(citing Brown v. Harris, 240 F.3d 383, 388–89 (4th Cir. 2001)). "Deliberate indifference requires
a showing that the defendants actually knew of and disregarded a substantial risk of serious
injury to the detainee or that they actually knew of and ignored a detainee's serious need for
medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575–76 (4th Cir. 2001). Further, to
establish a health care provider's actions constitute "deliberate indifference to a serious medical
need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the
conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th
Cir. 1990). "Allegations that might be sufficient to support negligence and medical malpractice
claims do not, without more, rise to the level of a cognizable § 1983 claim." Woodward v.
Cloninger, 3:18cv220, 2018 WL 4052170, at *2 (W.D.N.C. Aug. 24, 2018).

   In the detention suicide context, deliberate indifference requires the plaintiff to show (1)
the detainee suffered from a "substantial risk of suicide," Brown, 240 F.3d at 389; (2) the
defendant subjectively knew the substantial risk of suicide, which requires a showing the
defendant "actually knew of the detainee's suicidal intent, not merely that he should have
recognized it," Hearn v. Lancaster Cnty., 566 F. App'x 231, 236 (4th Cir. 2014) (unpublished);
and (3) the defendant must subjectively recognize that his or her actions were "inappropriate in
light of that risk [of harm]," Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "A failure to
recognize warning signs of suicide is insufficient" to establish deliberate indifference to a serious
medical need. Short v. Stokes, No. 1:18cv741, 2021 WL 620933, at **7–9 (M.D.N.C. Feb. 17,
2021).

   Furthermore, the fact that an inmate had a history of prior suicidal ideations is not
sufficient evidence to establish the inmate is currently suicidal. Smith v. Atkins, 777 F. Supp. 2d

955, 966 (E.D.N.C. 2011) (holding a jail nurse was not liable for the schizophrenic inmate's suicide even though the inmate was suicidal two years earlier). A lapse in time between suicide ideations defeats the notion that defendants knew and disregarded an objectively serious risk that the inmate would commit suicide. See, e.g., Matos ex rel. Matos v. O'Sullivan, 335 F.3d 553, 557–58 (7th Cir. 2003); Lambert v. City of Dumas, 187 F.3d 931, 937–38 (8th Cir. 1999).

Finally, to prevail on his Section 1983 claim, Plaintiff must show that the government official acted "personally in the deprivation of the plaintiff's rights." Bostic v. Rodriguez, 667 F. Supp. 2d 591, 612 (E.D.N.C. 2009) (citing Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)); accord Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1997) ("liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.").

Plaintiff has produced no evidence on summary judgment raising a genuine issue of disputed fact as to whether the Wellpath Defendants deliberately disregarded Mr. Thompson's serious medical needs. It is undisputed that the Wellpath Defendants had no notice of Mr. Thompson's prior attempts to hurt himself. Moreover, based on Mr. Thompson's representations and their professional assessments of Mr. Thompson, these Defendants had no reason to conclude that Mr. Thompson was at risk of committing suicide under all acceptable applicable standards of healthcare. It is undisputed that the Wellpath Defendants were not put on notice by any document or any other party, including Mr. Thompson, that he was in a mental health crisis or had any active thoughts of suicide or of hurting himself. That is, the CMPD officers failed to report Mr. Thompson's prior suicide attempts to the staff at the Jail; Mr. Thompson did not tell any staff at the Jail that he attempted suicide twice earlier that day; and Mr. Thompson's demeanor, physical appearance, and communications did not indicate he was suicidal.

Additionally, the record evidence shows that the Wellpath Defendants provided Mr. Thompson with adequate medical treatment, properly analyzed his risk for suicide, requested his prescription medications and dosing information, and promptly responded to Mr. Thompson's medical needs. In the short time Mr. Thompson was under medical care at the Jail, and within the first three hours of his time in jail, two licensed registered nurses assessed him on two different occasions, provided medical and mental health screens, took his vital signs, placed him on routine blood pressure checks, referred him to a mental health provider for a mental health provider appointment, changed his head bandage, and issued medication orders to continue his pre-jail medications.

Specifically, as to Nurse Elliott-McLaren, the WellPath employee who arguably had the most information about Mr. Thompson's situation, she knew <u>at most</u> that Mr. Thompson had suffered from depression and that he had had thoughts of suicide two years before. Knowledge of those two facts is not evidence of imminent suicidal ideation such that Elliott-McLaren's failure to place Mr. Thompson under suicide watch was a violation of Mr. Thompson's federal constitutional rights. This is particularly true based on Elliot-McLaren's observation that Mr. Thompson did not appear suicidal at the Jail and because Mr. Thompson expressly denied being suicidal. As the Court has already noted, in the detention suicide context, deliberate indifference requires the plaintiff to show that the defendant <u>subjectively knew</u> about an inmate's substantial risk of suicide, which means that the defendant "actually knew of the detainee's suicidal intent, not merely that he <u>should have recognized it</u>." <u>Hearn v. Lancaster Cnty.</u>, 566 F. App'x 231, 236 (4th Cir. 2014) (unpublished) (emphasis added). Here, Plaintiff simply has not shown that either Nurse Elliot-McLaren or Nurse Roberts was aware that Mr. Thompson was suicidal at the Jail.

Specifically, as to Wellpath, LLC, the Fourth Circuit has conditioned liability for private

13

corporations under 42 U.S.C. § 1983 on the same requirements established for municipal corporations. Rodriguez v. Smithfield Packing Co, Inc., 338 F.3d 348, 355 (4th Cir. 2003). Section 1983 liability cannot be based solely on a theory of respondeat superior. Austin v. Paramount Parks, Inc., 195 F.3d 715, 728 (4th Cir. 1999). Instead, to establish Section 1983 liability for a private corporation, a plaintiff must show that "an official policy or custom of the corporation cause[d] the alleged deprivation of federal rights." Id. Plaintiff has not shown that there was any deprivation of federal rights, nor has Plaintiff produced any evidence of an official policy or custom of Wellpath, LLC that resulted in the deprivation of Mr. Thompson's federal rights.

In sum, based on what the Jail healthcare providers were told, how Thompson responded to the suicide screening questions, and on the nurses' professional assessment of Thompson's demeanor, there is no evidence that Thompson's presentation created a risk of suicide so obvious that even a lay person would easily recognize the risk. Thus, as to the Wellpath Defendants, Plaintiff has not shown that there is a genuine issue of disputed material fact as to the claim against them for deliberate indifference to Mr. Thompson's serious medical needs, and the Wellpath Defendants are entitled to summary judgment as to this claim.[3]

For the same reasons that Plaintiff's deliberate indifference claim fails against the Wellpath Defendants, so does Plaintiff's claim for wrongful death under North Carolina law. The North Carolina wrongful death statute states, in pertinent part: "When the death of a person is caused by a wrongful act, neglect or default of another…the person or corporation that would

---

[3] The Court notes that the Wellpath Defendants do not appear to argue qualified immunity as an affirmative defense. In any event, the Court finds no federal constitutional violation in the first instance, and the Court therefore does not discuss qualified immunity.

have been so liable… shall be liable to an action for damages, to be brought by the personal representative or collector of the decedent." N.C. GEN. STAT. § 28A-18-2. A jail official may be held liable under North Carolina law for the suicide of a prisoner only "if he had knowledge, or reason to know, that a prisoner was a danger to himself and failed to take precautions." Smith v. Phillips, 117 N.C. App. 378, 384 (1994) (internal citations omitted).

Finally, since the deliberate indifference and wrongful death claims against the Wellpath Defendants are being dismissed, Plaintiff's punitive damages against these Defendants must also be dismissed.

In sum, the Wellpath Defendants are entitled to summary judgment as to all of Plaintiffs' claims against them.

### B.     The Sheriff's Office Defendants

Plaintiff asserts the following claims against Mecklenburg County Sheriff Garry McFadden, Mecklenburg County Sheriff's deputy Louis Venant, and the Sheriff's surety, Ohio Casualty Insurance Company ("the Sheriff's Office Defendants): (1) a deliberate indifference claim under Section 1983 based on failure to provide medical care and treatment; (2) a claim for wrongful death under N.C. GEN. STAT. § 28-174, and (3) punitive damages. Plaintiff also purports to bring a Monell-type claim against Sheriff McFadden in his official capacity based on failure to provide mental health treatment, failure to train and supervise, and failure to provide adequate staffing.

#### i.     Defendant Venant, Intake Officer at the Jail

First, as to Defendant Venant, who served as the intake officer at the Jail, Plaintiff cannot prove the deliberate indifference subjective element because there is no evidence adduced in discovery that Venant (1) participated in the screening process; (2) knew Mr. Thompson had a

15

serious medical need; or (3) that he ignored it. First, unlike deputy Sisk who asked Mr. Thompson the initial screening questions, Venant was not involved in the screening process at all. (Venant Dep. 36:20–21). Venant made a copy of Mr. Thompson's release form allowing him to be processed at the Jail, and he provided the copy to medical. (Id. 36:5–15). He then fingerprinted and photographed Mr. Thompson. (Id. 36:16–19). Venant's mere presence at the intake area of the Jail on the same day that Mr. Thompson committed suicide cannot translate into personal liability under Section 1983.

Furthermore, Plaintiff has produced no evidence that Venant knew Mr. Thompson had a serious medical need. It is undisputed that no one ever informed Venant that Mr. Thompson was a suicide risk. (Id. 41:12–14). That is, no one from CMPD informed anyone from the Sheriff's Office that Mr. Thompson was a suicide risk. (Id., Ex. 2). In addition to being required to prove that Venant knew of Mr. Thompson's risk, Plaintiff must prove that Venant did nothing to ameliorate the situation after becoming "aware of acts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1988) (internal citations omitted). Here, Venant was presented with a release form allowing Mr. Thompson to be processed at the Jail. (Venant Dep. 35:15–21). He also knew that after the initial screening, a nurse would assess Mr. Thompson in greater depth using the Receiving Screening with Mental Health form. (LV 33:17–25). To satisfy the subjective prong, Venant must have not only appreciated the "general risk," but he also must have appreciated the "incremental risk" that Thompson was going to commit suicide. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 304 (4th Cir. 2004). In other words, the "incremental risk" must be "so obvious as to justify an inference of actual knowledge." Id. There are no facts suggesting that Venant appreciated the specific risk that Mr. Thompson was a suicide risk, and

that he ignored it. For these reasons, Venant did not violate Mr. Thompson's due process rights based on deliberate indifference.

The Court notes that Defendant Venant raised the defense of qualified immunity. Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court reviewing qualified immunity first considers whether "the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). If the facts could establish a constitutional violation, the Court must analyze whether the constitutional right alleged to have been violated was "clearly established" at the time of the officer's actions.

The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition. . . ." Saucier, 533 U.S. at 201. Such a right is "clearly established" for qualified immunity purposes by decisions of the U.S. Supreme Court, Fourth Circuit Court of Appeals, or the highest court of the state where the case arose. Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." Harlow, 457 U.S. at 818.

The Court finds that, alternatively, Venant is entitled to qualified immunity because he did not violate Mr. Thompson's clearly established rights. Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991). As set forth earlier, there is no evidence that Venant had reason to suspect that Mr. Thompson was going to commit suicide. Venant only fingerprinted and photographed Mr. Thompson and had no interactions with him outside of this limited time. As the Fourth

Circuit has repeatedly stated, "[it] is well settled that officers are entitled to qualified immunity if they had no reason to suspect that the prisoner was a suicide risk." Belcher v. Oliver, 898 F.2d 32, 35 (4th Cir. 1990); see also Gordon v. Kidd, 971 F.2d. 1087, 1094 (4th Cir. 1992). As the Fourth Circuit recently held, "if the allegations show that the officer lacked the requisite subjective knowledge, then the officers would not have violated clearly established law," and would therefore be entitled to qualified immunity. Mays v. Sprinkle, 992 F.3d. 295, 302 (4th Cir. 2021).

Additionally, Venant is entitled to qualified immunity because he reasonably relied on the assessment by the medical provider at Atrium Health-Pineville, which released Mr. Thompson to be processed at the Jail, and by his knowledge that nurse Elliott-McLaren was going to further assess whether Mr. Thompson was a suicide risk. Notably, a jail official's "failure to take further action once he had referred the matter to the medical providers can[not] be viewed as deliberate indifference." Greeno v. Daley, 414 F.3d 645, 655–56 (7th Cir. 2005). It was reasonable for Venant to rely on the medical professionals at Atrium Health-Pineville that Mr. Thompson was not in medical distress. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (stating that officials are entitled to rely on judgment of medical personnel); Shelton v. Angelone, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment." ); Strange v. O'Brien, 7:10cv151, 2010 WL 8750304, at *4 (W.D. Va. July 30, 2010) (unpublished) ("Without any medical expertise of his own, however, O'Brien rightfully relied on the professional judgments of his medical staff as to the appropriate course of treatment for Strange's injured foot, and in so doing, was not deliberately indifferent to a risk of harm known to him."). In addition, there is also no evidence that Mr. Thompson's condition worsened, was life-threatening, and that Venant

18

"intentionally ignored the situation and refused to seek medical assistance." Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986).

In sum, since Venant was not deliberately indifferent to a serious medical need, he committed no constitutional violation, and is therefore entitled to dismissal both on the merits and based on qualified immunity. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (noting that courts addressing qualified immunity may first ask "'whether a constitutional violation occurred'" before asking "'whether the right violated was clearly established, . . . [because] [i]f [an officer] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there'").

Next, for the same reasons that Defendant Venant is entitled to summary judgment on Plaintiff's deliberate indifference claim, he is also entitled to summary judgment as to the North Carolina wrongful death claim. As to that claim, Plaintiff must demonstrate that Venant committed an act or omission which caused Mr. Thompson's death. Lane v. Dorney, 250 N.C. 15, 21 (1959); see also N.C. GEN. STAT. § 28-174. A jail official may be held liable under North Carolina law for the suicide of a prisoner only "if he had knowledge, or reason to know, that a prisoner was a danger to himself and failed to take precautions." Smith v. Phillips, 117 N.C. App. 378, 384 (1994) (internal citations omitted). As set forth earlier, Venant only fingerprinted and photographed Plaintiff. Plaintiff has produced no evidence showing that Venant had knowledge or reason to know that Plaintiff was suicidal.

The North Carolina state law claims of injury to prisoner and wrongful death against Venant are also barred. The injury to prisoner statute, N.C. GEN. STAT. § 162–55, provides that "[i]f the keeper of a jail shall do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law, he shall not only pay treble damages to the person

19

injured, but shall be guilty of a Class I misdemeanor." Under N.C. GEN. STAT., Plaintiff must "prove beyond a reasonable doubt that the jailer intended to injure the plaintiff or that the jailer was guilty of criminal negligence." Ramsey v. Schauble, 141 F. Supp. 2d 584, 591 (W.D.N.C. 2001). Plaintiff has produced no evidence that Venant intended to injure Mr. Thompson or that any if his conduct would rise to the level of criminal negligence.

The Court further finds that Plaintiff's claims against Venant in his individual capacity are also barred by public official immunity. Jailers and deputies are public officials. Baker v. Smith, 224 N.C. App. 423, 434 (2012). A "public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." Slade v. Vernon, 110 N.C. App. 422, 428 (1993). Stated another way, "[p]ublic officers are absolutely immune from liability for discretionary acts absent a showing of malice or corruption." Jones v. Kearns, 120 N.C. App. 301, 305 (1995). Here, Plaintiff has produced no evidence that Venant acted maliciously or corruptly in this case. Thus, Venant is entitled to public official immunity.

Finally, without any underlying remaining claims, the punitive damages claim against Venant will also be dismissed.

**ii.    Sheriff McFadden in His Official Capacity**

a.    Plaintiff's Monell Claims against Sheriff McFadden in His Official Capacity Based on Failure to Provide Adequate Mental Health Treatment, Failure to Train and Supervise, and Failure to Maintain Adequate Staffing

Plaintiff's claims against Sheriff McFadden in his official capacity constitute claims against the Mecklenburg County Sheriff's Office. Kentucky v. Graham, 473 U.S. 159, 165–66

20

(1985). It is well-established that there can be no municipal liability without any underlying violation of Thompson's rights. Grayson v. Peed, 195 F.3d. 692, 697 (4th Cir. 1999) ("[a]s there are no underlying constitutional violations by any individual, there can be no municipal liability."). See also Andrews v. Wayne Cnty., Michigan, 957 F.3d. 714, 724 (6th Cir. 2020) ("a county can only be held liable if there is a showing of an underlying constitutional violation by the county's officials."). As the Court has already discussed, Venant did not violate Mr. Thompson's constitutional rights. Therefore, there can be no finding of municipal liability by the Mecklenburg County Sheriff's Office.

Even if there were an underlying constitutional violation, liability only attaches to the Sheriff's Office if the deprivation of Mr. Thompson's constitutional rights was caused by an official policy or custom under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). In Monell, the U.S. Supreme Court held that a local government may be held liable for a constitutional violation where an official policy or custom caused the violation. A policy or custom under Monell may arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 217 (4th Cir. 1999)).

The Supreme Court has made it abundantly clear that a Plaintiff seeking to impose Monell liability bears a heavy burden: "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable

21

solely for the actions of its employee. [citation]." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405 (1997). The Fourth Circuit has noted that "[t]he substantive requirements for proof of municipal liability are stringent." Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994).

In sum, Monell liability only attaches to the Sheriff's Office if the deprivation of Mr. Thompson's constitutional rights was caused by an official policy or custom. Monell, 436 U.S. at 690. Plaintiff also must demonstrate that the Sheriff's Office policies or customs were the "moving force" behind the violation of Mr. Thompson's constitutional rights. Id. at 694.

Here, Plaintiff first contends that the Sheriff's Office should be held liable under Monell based on the Jail's policy or custom of ignoring inmates' mental health needs. Plaintiff has failed to meet this heavy burden, as Plaintiff has produced no evidence of a policy or custom from the Sheriff's Office that resulted in a violation of Mr. Thompson's constitutional rights. Moreover, the Sherriff's Office has shown that it has numerous policies and customs in place for assessing that mental health of inmates at the Jail and to determine when an inmate may need to be put on suicide watch.

First, as set forth in Sheriff McFadden's declaration, at the time of Mr. Thompson's suicide, the Sheriff's Office contracted with Wellpath to provide primary care, as well as mental health care. (McFadden Dec. ¶ 5). The Wellpath contract included funding for a psychiatric registered nurse, psychiatrist, mental health director, mental health clinician, and mental health transition planner. (Id.). There were three main medical units at the Jail. (House Dep. 25: 25; 26:1–8). The Jail had "main medical," where medical staff dealt with "any type of acute episodic illnesses, injuries, chronic care." (Id. 24:24–25; 25:1–2). In arrest processing, nurses saw newly arrested inmates and that "was staffed with nurses around the clock." (Id. 25:9–13). The Jail also

22

had administrative offices where the director of nursing, and other administrative staff, were located. (Id. 25:14–22). The Jail also provided mental health services. (Id. 26:14–21). For mental health assessments and treatment, the Jail had a staff psychiatrist, a telehealth psychiatrist, and other mental health workers, social workers, and licensed counselors. (Id. 26:23–25; 27:1–5).

Second, an arrestee's medical and mental health needs are not ignored when an individual is processed at the Jail. Deputies perform the initial screening with the assistance of the Receiving Screening for Mental Health form, and Wellpath nurses "would further ask the patient why he or she answered yes to those questions." (Elliott-McLaren Dep. 63:11–18). Nurses in arrest processing do a "brief head to toe," go through a medical questionnaire, and verify any medications. (House Dep. 30:1–10). In Arrest Processing, nurses also "basically determine if perhaps the patient needs to be put on a suicide watch or not." (Id. 30:11–13). Under these facts, there can be no Monell liability for failure to assess and provide medical care.

Plaintiff also brings a failure to train and supervise claim against Sheriff McFadden, alleging that McFadden is liable for a failure to "properly train and supervise [his] employees and subordinates to recognize and appropriately respond to mental health care emergencies." (Doc. No. 19, ¶ 139). First, the failure to train claim fails because there is no underlying constitutional violation. Andrews, 957 F.3d at 724 ("[a]s the district court recognized, Andrews cannot prevail on a failure-to-train theory of liability against the County because no constitutional tort was committed.").

In any event, Plaintiff has not presented evidence showing that the Sheriff's Office was deliberately indifferent in its training. A sheriff's office may be liable for the failure to train its employees only where such failure "reflects 'deliberate indifference' to the rights of its citizens." Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000) (quoting City of Canton v. Harris, 489 U.S.

378, 388 (1989)). Deliberate indifference may be found where "'in light of the duties assigned to specific officers or employees, the need for more or different training is ... obvious, and the [failure to train is] likely to result in the violation of constitutional rights.'" City of Canton, 489 U.S. at 390.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997). A plaintiff asserting a failure to train claim bears the burden of proving that the challenged training program is inadequate with respect to the specific tasks performed. Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994). To recover under this "tenuous" theory of liability, a plaintiff must identify a "specific deficiency rather than general laxness or ineffectiveness in training." Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987). The officers in this case were properly trained in asking the questions listed in the Receiving Screening with Mental Health form and then providing this information to medical professionals. (Sisk Dep. 34:5–21; 54:4–25; 55:1–17, Venant Dep. 33:3–12). Venant and Sisk were not trained in assessing mental health issues because they are not medical professionals.

For the Receiving Screening with Mental Health form, the deputy would ask the questions, and then the nurse would follow up with the arrestee about his or her answers. (Elliott-McLaren Dep. 64:13–17). As nurse Elliott-McLaren stated in her deposition, "[t]he mental health screening is done by a nurse just to identify those clues for the continuation of the patient care." (Id. 61:21–25; 62:1–7). Accordingly, given that medical staff have more expertise than jail officials, Plaintiff has failed to show that the Sheriff's Office failure to train its officers to either ignore or override the advice of medical staff made Mr. Thompson's injury "bound to happen, sooner or later." Carter, 164 F.3d at 218. Thus, Sheriff McFadden is entitled to summary

24

judgment on the failure to train claim.

In her last Monell claim, Plaintiff alleges that Sheriff McFadden was "deliberately indifferent" in "fail[ing] to remedy the understaffing problems and shortages that have been persistent and ongoing at the Mecklenburg County Detention Center." (Doc. No. 19, ¶ 148). Plaintiff claims that there was inadequate staffing to monitor inmates, an inadequate jail monitoring system, and inadequate management software. (Id. at ¶ 149).

First, this claim fails because, again, there was no underlying constitutional violation. In any event, to prevail on a claim of understaffing, Plaintiff must show that there was a policy at the Jail of deliberate indifference to the risk of under-staffing, and that this policy caused Mr. Thompson's injury. Payton v. CEO, Corrs. Corp. of Am., No. 14-cv-959, 2015 WL 52104, at *3 (W.D. La. Jan. 2, 2015) (unpublished). "Evidence of understaffing, without more, is not proof of [an] official policy." Id. (citing Gagne v. City of Galveston, 671 F. Supp. 1130, 1135 (S.D. Tex. 1987)). Evidence of under-staffing becomes proof of an official policy only if (1) more complete funding and staffing were possible and (2) it was the deliberate intent of the policy-making official not to adequately fund and staff the jail. Id. Plaintiff has not produced evidence on either of these two elements at summary judgment.

Furthermore, in opposition to the summary judgment motion, Defendant has produced evidence showing that the Jail was fully staffed on July 11, 2018. Main medical and Arrest Processing were staffed 24/7 on July 11, 2018, and mental health professionals worked 7 or 8 a.m. to 5 p.m. and were available on call the rest of the day. (House Dep. 39:6–24). In Pod 3100, there was "normal staffing for the day." (Breedlove Dep. 85:15–20). During the 2018-2019 fiscal year, there were 342 detention officers employed at DC-C and an additional 58 deputy sheriffs employed in roles like arrest processing. (McFadden Dec. ¶ 7). At all times, the Jail complied

with Sheriff's Standards requirements for staffing set forth in the North Carolina Administrative Code. (Id. ¶ 8).

Defendants have further presented evidence showing that, in fiscal year 2018-2019, the budget allocated for the Mecklenburg County Jail Central[4] was $73,569,383. (Id. ¶ 4). $8,978,581 of this budget was allocated for resident medical care, which included contracting with Wellpath for medical as well as for mental health care at the Jail. (Id. ¶ 5). The Wellpath contract included funding for the following mental health positions: psychiatric registered nurse, psychiatrist, mental health director, mental health clinician, and mental health transition planner. (McFadden Dec. ¶ 5).

The evidence also demonstrates that there were adequate jail monitoring systems and jail management software. The DC-C Budget allocated money for Detention Services in the amount of $60,941,690, Facility Management in the amount of $7,479,983, Resident Finance and Support in the amount of $2,237,728, Resident Library Services in the amount of $207,779 and Rehabilitation Services in the amount of $2,702,203. (Id. ¶ 6). These budget items paid for jail monitoring systems, and management software, including the Offender Management System ("OMS") which is the system used for tracking DC-C residents. (Id.). Within OMS, officers document activities using the OMS shift log. The Sheriff's Office also paid for a monitoring system called "Cornerstone" that synchronizes and maintains cameras and the DC-C access systems. (Id.). In addition, the Sheriff's Office paid for a system called "Tour Watch" which tracked cell checks. (Id.).

In sum, Plaintiff has not presented evidence on summary judgment sufficient to raise a

---

[4] On July 11, 2018, the Mecklenburg County Sheriff's Office had two jails: Jail Central where Mr. Thompson was housed, and Jail North.

26

genuine fact as to whether Sheriff McFadden is liable in his official capacity based on <u>Monell</u>.

Thus, Sheriff McFadden is entitled to summary judgment on all of Plaintiff's <u>Monell</u> claims.

     b.  <u>Plaintiff's State Law Claims against Sheriff McFadden in His Official Capacity</u>

Sheriff McFadden is also entitled to summary judgment on Plaintiff's North Carolina tort claims of injury to prisoner, wrongful death, and action on bond. First, the official capacity wrongful death and injury to prisoner claims against Sheriff McFadden are dismissed based on the doctrine of sovereign immunity, which "shields municipalities and the officers or employees thereof sued in their official capacities from suits based on torts committed while performing a governmental function." <u>Houpe v. City of Statesville</u>, 128 N.C. App. 334, 340–41 (1998). While sovereign immunity is waived by purchase of insurance, sovereign immunity is retained for causes of action excluded by the insurance policy. <u>See</u> <u>Dickens v. Thorne</u>, 110 N.C. App. 39, 43 (1993). The operation of the jail is a governmental function for which sovereign immunity applies. <u>Hare v. Butler</u>, 99 N.C App. 693, 698 (1990).

Sheriff McFadden is entitled to sovereign immunity because the purchased insurance does not provide coverage for the wrongful death and injury to prisoner claims. (<u>See</u> Betty Coulter Decl., Sheriff Office Defendants' Ex. 3). The law enforcement liability coverage does not apply until the payment of a $2 million self-insured retention. (Coulter Dec. ¶ 10). This self-insured retention does not waive the Sheriff's Office's entitlement to sovereign immunity. <u>Kephart v. Pendergraph</u>, 131 N.C. App. 559, 564 (1998). Furthermore, the endorsement to this coverage states:

> "[t]he purchase of this policy is not intended by the Insured to waive its
> governmental immunity under North Carolina General Statutes Sect. 153A-
> 435…this policy provides coverage only from Wrongful Acts for which the
> defense of governmental immunity is clearly not applicable or which, after the
> defense of governmental immunity is asserted, a court of competent jurisdiction

27

determines the defense of governmental immunity is not applicable." (Coulter Dec. ¶ 11; Ex. 2 to Coulter Dec.). The language in this endorsement preserves Sheriff McFadden's sovereign immunity. Accord Patrick v. Wake Cnty. Dep't of Human Servs., 188 N.C. App. 592, 596 (2008) (where the liability insurance policy had similar language, finding that the defendant government entity did not waive sovereign immunity); see also Estate of Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 341–43 (2010) (finding no waiver of immunity where insurance contract excludes coverage for "[a]ny claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina Law"); accord Owen v. Haywood Cnty., 205 N.C. App. 456, 460 (2010); Cooper v. Brunswick Cnty. Sheriff's Dep't, 896 F. Supp. 2d 432, 453 (E.D.N.C. 2012); Russ v. Causey, 732 F. Supp. 2d 589, 609–11 (E.D.N.C. 2010).

Last, as to the Ohio Casualty Insurance Company, the Sheriff's surety bond is purchased pursuant to N.C. GEN. STAT. § 58-76-5, which "allows a plaintiff to maintain suit against a public officer and the surety on his official bond for acts of negligence in performing his official duties." Slade v. Vernon, 110 N.C. App. 422, 427 (1993). Without any underlying "acts of negligence," however, Ohio Casualty Insurance Company cannot be held liable and must be dismissed from this suit.

In sum, for the reasons stated herein, the Sheriff's Office Defendants are entitled to summary judgment on all of Plaintiff's claims against them.

### C.    The City Defendants

As noted, the City Defendants refer to the City of Charlotte, Officer Kurcsak, and Police Chief Jennings. Plaintiff brings the following claims against the City Defendants in the

Amended Complaint: (1) a <u>Monell</u> claim under Section 1983 against the City of Charlotte; (2) a Section 1983 claim against all City Defendants for deliberate indifference based on failure to provide medical care and treatment; (3) a wrongful death claim under N.C. GEN. STAT. § 28A-18-2; and (4) a claim for punitive damages.

      i.    <u>Officer Kurcsak</u>

First, as to Officer Kurcsak, in the Amended Complaint, Plaintiff brings a claim under 42 U.S.C. § 1983 against Officer Kurcsak in his individual capacity for "deliberate indifference to his serious and mental health needs and to proper medical care while in custody." (Doc. No. 19, p. 25, ¶ 115). Plaintiff, however, mistook the individually named CMPD officers in this case—including Officer Kurcsak—as the officers who transported Plaintiff to the hospital and then onto the Mecklenburg County Jail thereafter. (Doc. No. 19, p. 11, ¶¶ 44–48). As noted, Officer Kurcsak is a member of the Violent Crimes Apprehension Team ("VCAT") and was responsible for locating Mr. Thompson to arrest him for attempted murder. Upon locating Mr. Thompson Officer Kurcsak arrested and transported Mr. Thompson to the Steele Creek Division without incident. Therefore, contrary to the allegations in the Amended Complaint, Kurcsak was not one of the CMPD officers who transported Mr. Thompson the hospital and the Jail.

The undisputed facts on summary judgment show that when Officer Kurcsak took Mr. Thompson to the Steele Creek Division office: (1) Mr. Thompson was calm and polite during his arrest; (2) Officer Kurcsak reported to the accepting officer at Steele Creek the approximately 36-hour old alleged suicide threat made at the animal hospital by Mr. Thompson; (3) the lead detective on the case at the Steele Creek Division, Detective Lambe, testified that he knew about the alleged suicidal ideation; and (4) Officer Kurcsak had no further contact with Mr. Thompson after dropping him off at the Steele Creek Division. It is also undisputed that Mr. Thompson's

29

suicidal ideation occurred about 36 hours before his interaction with Officer Kurcsak, and his arrest took place without incident. Thus, Plaintiff's medical need was neither "apparent" nor "serious" when Officer Kurcsak left him at Steele Creek. Accordingly, Officer Kurcsak is entitled to summary judgment on Plaintiff's deliberate indifference claim.

The Court further notes that Officer Kurcsak has raised qualified immunity as a defense. The Court finds that even if Officer Kurcsak violated Mr. Thompson's constitutional rights, Officer Kurcsak is entitled to qualified immunity.[5] That is, Plaintiff has not pointed to any analogous cases from the U.S. Supreme Court, Fourth Circuit, or North Carolina Supreme Court where Officer Kurcsak would have been put on notice in 2018 that an officer is deliberately indifferent to a serious medical need of an individual in his custody where he does not himself take the individual for psychiatric evaluation where the individual allegedly made a suicidal threat more than a day before his interaction with the individual. Thus, Officer Kurcsak is entitled to qualified immunity as to Plaintiff's deliberate indifference claim.

For the same reasons that Officer Kurcsak is entitled to summary judgment on Plaintiff's deliberate indifference claims, he is also entitled to summary judgment on Plaintiff's wrongful death claim under N.C. GEN. STAT. § 28A-18-2. The evidence shows that Officer Kurcsak gathered information, arrested Mr. Thompson, transported him to Steele Creek, provided the above-identified information, and left. Furthermore, before leaving he reported to the accepting officer at Steele Creek the suicide threat Mr. Thompson made at the animal hospital 36 hours before that. On the record forecasted evidence, no reasonable juror could conclude that Officer Kurcsak breached a duty owed to Plaintiff or that he proximately caused his death. Accordingly,

---

[5] The Court has already set forth the law regarding qualified immunity and will not repeat it here.

he is entitled to summary judgment on the wrongful death claim.

Alternatively, Officer Kurcsak is entitled to public official immunity. "[A] public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Wilcox v. City of Asheville, 222 N.C. App. 285, 288 (2012), appeal dismissed, review denied, 336 N.C. 574 (2013). "[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Id. at 289. Plaintiff has failed to forecast evidence of any malicious conduct by Officer Kurcsak. Accordingly, he is entitled to public official immunity from the wrongful death claim.

ii.    Chief Johnny Jennings

Next, as to the claims against Chief Johnny Jennings in his individual capacity, in the Amended Complaint, Plaintiff makes one bare factual allegation against Chief Jennings: "Chief Johnny Jennings … is and was at all times relevant and complained herein the Chief of the Charlotte Mecklenburg Police Department, and [is] the ultimate supervisor of [the individual Defendants]." (Doc. No. 19, p. 3, ¶ 7). Thus, Plaintiff's theory of liability against Chief Jennings is solely based on alleged supervisory liability. To show supervisory liability, the plaintiff must prove: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Plaintiff has not proven supervisor liability against Chief Jennings because it is undisputed that Chief Jennings was not the Chief of CMPD on the relevant date to this case—

July 11, 2018—nor any date near that time period. Chief Jennings was appointed the Chief of the CMPD on or about July 1, 2020. Chief Jennings, therefore, cannot have proximately caused any injury to Mr. Thompson—constitutional or otherwise. See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (in a Section 1983 claim against a supervisor, plaintiff must prove "that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff"); N.C. GEN. STAT. § 28A-18-2(a) ("When the death of a person is caused by a wrongful act, neglect or default of another…"). Accordingly, Chief Jennings is entitled to summary judgment as to all claims brought against him in this action.

      iii.    <u>City of Charlotte</u>

Next, as to Plaintiff's claims against the City, Plaintiff brought individual-capacity claims under, inter alia, Section 1983 against three individual CMPD officers in this action—Officer Adelaide Kinstler, Brian Kurcsak, and Joseph Wilson. Plaintiff voluntarily dismissed with prejudice, through stipulation, her Decedent's claims as to Officers Kinstler and Wilson. (Doc. No. 87). This leaves Officer Kurcsak as the only remaining CMPD officer named in this lawsuit, and the Court has already determined that Officer Kurcsak is entitled to summary judgment on the claims against him. The City therefore cannot be held liable based on any acts of Officer Kurcsak.

As noted, "under § 1983, local governments [can be held] responsible . . . for their <u>own</u> illegal acts." <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011). That is, local governments are not vicariously liable under Section 1983 for their employees' actions. <u>Id.</u> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. <u>Id.</u> "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights

32

of persons with whom the police come into contact." <u>City of Canton</u>, 489 U.S. at 388. Moreover, Plaintiff must point to a "persistent and widespread" pattern of the relevant unconstitutional conduct at bar among Charlotte police officers that are "so permanent and well settled as to constitute a custom or usage with the force of law" in the City of Charlotte. <u>Monell</u>, 436 U.S at 691. Plaintiff has failed to forecast any of this evidence on summary judgment.

Plaintiff contends that the police department's policies and directives, "[w]hile… [being] some evidence of policies and training as it relates to dealing with the mentally ill . . . do not address the gap that contributed to the death of Mr. Thompson." (Doc. 101, p. 17). Plaintiff relies only on the alleged failures of various non-party officers in communication as after-the-fact evidence that the City's training and policies were insufficient. Plaintiff does not forecast any evidence that the City's policymakers had any notice that the alleged "gap" in training and policy "causes city employees to violate citizens' constitutional rights," such that deliberate indifference by the municipality itself can be inferred. <u>See</u> <u>Connick</u>, 563 U.S. at 61–62. Moreover, as Defendants note, the supposed failure of a local government to predict and "address [a] gap" in training is the very theory of liability that the U.S. Supreme Court has said is insufficient in <u>Monell</u> liability cases:

> In resolving the issue of a city's liability [under a § 1983 failure to train theory]… [n]either will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.
>
> . . . .
>
> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. Thus, permitting cases against cities for their 'failure to train' employees to go forward under §

33

> 1983 on a lesser standard of fault would result in de facto respondeat liability on municipalities… It would also engage federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well one that would implicate serious questions of federalism.

City of Canton, 489 U.S. at 390–92. That select officers may or may not have followed the training precisely is inapposite to a Monell claim against the City.

In his deposition, former Charlotte-Mecklenburg Police Chief Kerr Putney testified about the volume of training that was provided to CMPD on mental health crises, suicidal ideations, and communication related to those subjects. Chief Putney testified that officers were trained on suicidal ideations. (See Putney Dep. 25:17–21). Likewise, during his tenure, crisis intervention training was implemented in CMPD. (See Putney Dep. 22:8–22:23). There was "also implemented a first-aid to mental illness to basic crisis response, and everybody went through the eight hour course, the basic introductory course." (Putney Dep. 22:24–23:2). In response to a question about training to make determinations about involuntary commitments, Chief Putney gave a substantive response, identified infra, but commented also that "yes, [there] was a significant increase in that training." (Putney Dep. 24:25–25:1). Putney also testified that officers were also trained on how to deescalate situations and handle subjects with suicide ideations by "demeanor and… communication," and since around 2016 or 2017—for example, one year or two before the events underlying this lawsuit—officers could "alert the Community Policing Crisis Response Team."[6] (Putney Dep. 26:7–27:15).

---

[6] Chief Putney described the Community Policing Crisis Response Team as "we put an officer in a car with a clinician, and they go out proactively to engage with people that we know have had a mental health issue in the past or mental health crisis to keep them on their meds, to make sure they got support from the family they need, and to give them the services that they need to keep them in a calm and functioning state." (Putney Dep. 24:16–24).

When examined on the communication of suicide attempts while in officers' presence, Chief Putney testified, referring to the police department, that "[w]e have a policy that requires" making sure that the Mecklenburg County Detention Center and medical providers were informed of suicidal behavior. (See Putney Dep. 30:22–31:19). Chief Putney elaborated as to what a transporting officer needed to do per policy:

> They need to heed the policy. So that means they should make notifications. Generally an officer would want to notify his or her supervisor, and then as a I stated before, if there is a transport and somebody else takes custody, they need to inform the new custodian, also.

(Putney Dep. 32:17–23). That this chain of communication did not occur in this case when CMPD officers—none of which are defendants in this action—transported Mr. Thompson to the hospital and the Jail thereafter irrelevant as to Section 1983 liability as to the City (and Chief Jennings).

Testifying officers corroborate this uncontroverted testimony that this training took place. For example, Officer Kinstler testified that she received extensive training on mental health issues, including "numerous hours of training on de-escalation, dealing with subject with mental illness, dealing with suicidal subjects, dealing with people that want to commit suicide by cop, hands on training, also virtual training. (Kinstler Dep. 21:21–22:10). Similarly, Detective Lambe—the Steele Creek Division detective who was the investigating officer and received custody of the Decedent from Officer Kurcsak—when examined by Plaintiff in deposition, testified that he was trained by CMPD on dealing with people who suffer from mental illness and about the CMPD directives related to transport of mentally ill prisoners, specifically Crisis Intervention Training. (Lambe Dep. 12:24–14:7, 15:2–16). Finally, the City produced in discovery various directives and policies it maintained related to "transfer of in custody arrestees,

including those in need of assistance, to the Mecklenburg County Jail," (The City Defendants' Ex. 6).

Here, on summary judgment, Defendants have presented evidence that the City had policies and training pertaining to subjects with mental illness that are in police custody. Moreover, Plaintiff has not forecasted evidence of any widespread pattern of similar constitutional violations as to the one allegedly suffered by Mr. Thompson, nor does the forecast of evidence disclose any failure to train officers on management of subjects with mental illness, both in-custody and during transport. Such a theory, allowed to proceed to trial, "would result in de facto respondeat superior liability on municipalities—a result we rejected in Monell… It would also engage the federal courts in an endless exercise of second-guess municipal employee-training programs." Harris, 489 U.S. at 392. Simply put, the record reflects that Plaintiff has not forecasted any evidence such to sustain a "failure to implement protective policies and failure to train." Accordingly, the City is entitled to summary judgment on the claims brought against it.

Finally, as none of the City Defendants can be liable for any compensatory damages, they also cannot be liable for the punitive damages claim. See N.C. GEN. STAT. § 1D-15(a) ("Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages…").

## IV.    CONCLUSION

In sum, for the reasons stated herein, Defendants' summary judgment motions are all granted, and all of Plaintiff's claims against all Defendants are hereby dismissed.

**IT IS, THEREFORE, ORDERED** that:

(1) The Motion for Summary Judgment by Defendants Wellpath LLC, Ebone Denise Roberts, and Samantha Elliott-McLaren, (Doc. No. 86), is **GRANTED**.

36

(2) The Motion for Summary Judgment by Joseph Breedlove, Garry L. McFadden, and the Ohio Casualty Insurance Company, (Doc. No. 90), is **GRANTED**.

(3) The Motion for Summary Judgment by the City of Charlotte, Johnny Jennings, and Brian E. Kurcsak, (Doc. No. 92), is **GRANTED**.

(4) This action is dismissed with prejudice.

(5) The Clerk is respectfully instructed to terminate this action.

Signed: August 24, 2023

Max O. Cogburn Jr.
United States District Judge

37